UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

APARTMENT INCOME REIT CORP.,

       Plaintiff,

v.

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON SUBSCRIBING TO POLICY NO.
B0713MEDTE2202301 and EVEREST NATIONAL
INSURANCE COMPANY,

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Apartment Income REIT Corp. ("AIR"), by its undersigned attorneys, files this Complaint against Defendants Certain Underwriters at Lloyd's London Subscribing to Policy No. B0713MEDTE2202301 (the "Primary Insurers"), and Everest National Insurance Company ("Everest") and alleges as follows:

### INTRODUCTION

1. AIR seeks defense costs and indemnification under a primary data protection liability insurance policy underwritten by the Primary Insurers, and a follow-form excess insurance policy issued by Everest.

2. In June 2023, AIR submitted a claim for coverage under the policies related to sprawling allegations of an antitrust conspiracy involving the multifamily rental housing

industry's alleged use of RealPage, Inc.'s revenue management software, which became the focus of multiple legal actions.

3. The claims alleged against AIR fall squarely within the Privacy Liability, Privacy Regulatory Liability and Multimedia Liability Coverages provided by the insurers.

4. Nevertheless, the Primary Insurers and Everest wrongfully denied coverage.

5. Furthermore, the Primary Insurers' prolonged delay in providing a coverage decision, failure to investigate AIR's claim, repeated misrepresentations of policy provisions, and interference with AIR's ability to settle promptly, together, demonstrate that the Primary Insurers have acted in bad faith and under circumstances evincing willful and wanton conduct.

## PARTIES

6. Plaintiff AIR is incorporated under the laws of Maryland, and has its principal place of business in Denver, Colorado.

7. Defendants Certain Underwriters at Lloyd's London Subscribing to Policy No. B0713MEDTE2202301 are members of Lloyd's Underwriter Syndicate No. 457 MRS and Lloyd's Underwriter Syndicate 1618 KII.

8. Lloyd's Underwriter Syndicate No. 457 MRS ("Munich Re") is an unincorporated insurance syndicate engaged in the business of underwriting insurance policies at Lloyd's of London, England. Its sole member is Munich Re Capital Limited, a private limited company, incorporated under the Laws of England and Wales, with its principal place of business in London, England. And its managing agent is Munich Re Syndicate Limited, which is also a private limited company, incorporated under the Laws of England and Wales, with its principal place of business in the United Kingdom.

9.      Lloyd's Underwriter Syndicate 1618 KII ("Ki" ) is an unincorporated insurance syndicate engaged in the business of underwriting insurance policies at Lloyd's of London, England. Its managing agent is Brit Syndicates Limited, a private limited company formed under the laws of the United Kingdom, with its principal place of business in the United Kingdom. Upon information and belief, its sole member is a limited company formed under the laws of the United Kingdom, with its principal place of business in the United Kingdom.

10.     Defendant Everest is incorporated under the laws of Delaware, and has its principal place of business in Warren, New Jersey.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332 because AIR is a Maryland corporation; the members of the Primary Insurers are United Kingdom limited companies, and defendant Everest is a Delaware corporation; and the amount in controversy exceeds $75,000.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, facts and circumstances giving rise to the claims occurred with the District.

## FACTS

**A.      The Data Protection Insurance Policies Provided to AIR**

13.     AIR purchased from the "Primary Insurers" a data protection liability insurance policy (the "Primary Policy" or "Policy"), Policy No. B0713MEDTE2202301, for the policy period from October 1, 2022 to October 1, 2023 with an extended reporting period through December 30, 2023. A true and correct copy of the Primary Policy is attached as **Exhibit A**.

14.     The Primary Policy is underwritten 70 percent by Munich Re and 30 percent by

Ki.

15.     The Primary Policy is comprised of 13 individual Liability Coverages, including a

Privacy Liability Coverage, with a $5,000,000 sublimit of liability, Privacy Regulatory Liability

Coverage, with a $5,000,000 sublimit of liability, and a Multimedia Liability Coverage, also with

a $5,000,000 sublimit of liability.

16.     The aggregate limit of liability for the Primary Policy is $5,000,000.

17.     Under the Primary Policy, the retention that AIR is required to pay for each

coverage, including the Privacy Liability, Privacy Regulatory Liability and Multimedia Liability

Coverages, is $200,000.

18.     AIR has incurred and paid for losses exceeding the retention.

19.     AIR purchased from Everest an excess policy (the "Excess Policy"), Policy No.

CY5EX00375-221, for the policy period from October 1, 2022 to October 1, 2023. A true and

correct copy of the Excess Policy is attached as **Exhibit B**.

20.     The Excess Policy provides an aggregate limit of liability coverage of $5,000,000,

which attaches after the aggregate limit of liability of the Primary Policy has been exhausted.

21.     As relevant here, the Excess Liability Policy "follow[s] form to the terms and

conditions" of the Primary Policy. (Ex.B at 1.)

22.     Thus, the Primary Insurers agreed to pay covered amounts in excess of the

retention, up to $5,000,000, while Everest agreed to pay covered amounts above $5,000,000 and

up to $10,000,000. Together, Munich Re, Ki, and Everest are referred to herein as the Insurers.

### 1.    Privacy Liability Coverage

23.    Under the Privacy Liability Coverage, the Insurers agreed to pay amounts that
AIR is legally obligated to pay as **Damages** or **Claims Expenses**—including settlement amounts
and defense fees and costs (*see* Ex. A §§ IV.L, S)—that arise from a **Claim** first made against
AIR during the policy period or extended reporting period and that "arise out of an actual or
alleged **Privacy Liability Event** by [AIR] or parties for whom [AIR] is **Vicariously Liable**."
(Ex. A § I.A.1.)

24.    Under the Primary Policy, for all Coverages, **Vicariously Liable** means "legal
responsibility of [AIR] for the wrongful acts and resulting liability of others, including legal
responsibility assumed by [AIR] in a written contract." (Ex. A § IV.NNN.)

25.    The Primary Policy provides that "**Privacy Liability Event** means . . . [a]
**Privacy Breach**" (Ex. A § IV.UU.1), and defines **Privacy Breach** to include:

> 1. [t]he unauthorized collection, retention, processing, disclosure,
> use, access, destruction or modification, or inability to access, or
> failure to provide **Private Information**;
>
> . . . [and]
>
> 9. failure to comply with a federal, state, foreign or other law
> (including common law), statute or regulation prohibiting unfair
> methods of competition, unfair or deceptive trade practices . . .
> pertaining to [AIR's] responsibilities with respect to **Private
> Information**, but only in connection with an act listed in
> paragraphs 1 through 7 above.
>
> (Ex. A § IV.SS.)

26.    The Policy defines **Private Information** as:

> 1. proprietary or confidential information owned by the Assured or
> by a third party that is in the care, custody or control of the

Assured or is used by the Assured with the consent of such third party;

2. information that can be used to determine, distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual;

3. any information that is linked or linkable to a specific individual or household that is protected from collection, disclosure, retention, or use by any applicable law.

(Ex. A § IV.WW.)

## 2.     Privacy Regulatory Liability Coverage

27.     Under the Privacy Regulatory Liability Coverage, the Insurers agreed to pay amounts that AIR is legally obligated to pay as **Regulatory Loss** or **Claims Expenses**—including settlement amounts and defense fees and costs (*see* Ex. A §§ IV.L, S)—that arise from a **Claim** first made against AIR during the policy period or extended reporting period and that "arise out of an actual or alleged **Breach Event** by [AIR] or parties for whom [AIR] is **Vicariously Liable**." (Ex. A § I.A.2.)

28.     The Primary Policy defines **Breach Event** to mean "an actual or reasonably suspected **System Security Breach**, or **Privacy Liability Event**" (Ex. A § IV.E), where **Privacy Liability Event** is defined the same as under the Privacy Liability Coverage, and includes a **Privacy Breach** (Ex. A § IV.UU.1), as defined by sections IV.SS and IV.WW of the Primary Policy.

## 3.     Multimedia Liability Coverage

29.     Under the Multimedia Liability Coverage, the Insurers agreed to pay amounts that AIR is legally obligated to pay as **Damages** or **Claims Expenses**—including settlement amounts and defense fees and cost (*see* Ex.A §§ IV.L, S)—that arise from a **Claim** first made against AIR

during the policy period or extended reporting period and that "arise out of an actual or alleged

**Multimedia Wrongful Act** by [AIR] or parties for whom [AIR] is **Vicariously Liable** . . . "

(Ex. A § I.A.5.)

30.    The Policy defines **Multimedia Wrongful Act** at section IV.II., but that

definition was "deleted and replaced" by an attached endorsement, Memorandum 1.

31.    Memorandum 1 defines **Multimedia Wrongful Act** as "any act, error, omission,

misstatement or misleading statement in connection with media in any form, including but not

limited to . . . electronic and digital media, that results in or consists of," among other things:

> 9. unfair competition or trade practices, including but not limited to
> dilution, confusion, deceptive trade practices or unfair trade
> practices, civil actions for consumer fraud, false, disruptive or
> misleading advertising or misrepresentation in advertising, but
> only if alleged in conjunction with any of the acts listed in
> paragraphs 1 through 9 above.

(Ex. A, Mem. 1.)

**4.    The Inapplicable Antitrust Exclusion**

32.    The Policy also contains various exclusions of coverage, including an antitrust

exclusion for "antitrust violations, restraint of trade, price fixing, or similar anti-competitive

conduct . . . ." (Ex. A § VI.H.)

33.    The antitrust exclusion expressly "shall not apply to a **Claim** under Coverage A.1

Privacy Liability, A.2 Privacy Regulatory Liability or A.5 Multimedia Liability" (*id.*), making

clear that those three coverage parts intentionally provide coverage for claims arising from anti-

competitive conduct.

B.      **The Legal Actions Alleging an Antitrust Conspiracy**

34.      In March 2023, following the filing of similar lawsuits across the nation, plaintiff

Elaine Spencer filed a class-action complaint in Pennsylvania federal court, against RealPage,

AIR, and several other lessors of multifamily housing, alleging the defendants had participated in

an antitrust conspiracy to use RealPage's revenue management systems to artificially inflate

rents for multifamily housing above market. *Spencer v. RealPage, Inc.*, No. 2:23-cv-01019-

MAK (E.D. Pa.).

35.      About a month later, Joseph Bauman filed a another class action complaint

naming AIR, this time in Tennessee. *Bauman v. RealPage, Inc.*, No. 3:23-cv-00326 (M.D.

Tenn.).

36.      Although the *Spencer* and *Bauman* actions have now been dismissed, new class

actions were filed in Tennessee and Georgia, and all related class action litigation has been

consolidated in multidistrict litigation (the "MDL"). *See In re RealPage Inc., Rental Software*

*Antitrust Litigation*, No. 3:23-md-03071, MDL No. 3071 (M.D. Tenn.).

37.      The Second Amended Consolidated Class Action Complaint in the MDL (the

"Second MDL Complaint") is the operative complaint in the consolidated litigation, and names

AIR as a defendant, as do the underlying actions that remain active. The Second MDL

Complaint is attached as **Exhibit C**.

38.      The Second MDL Complaint alleges that RealPage, AIR, and a host of other

owners and operators of multifamily rental housing conspired "to fix and inflate the price of

multifamily rental housing across the country" by using RealPage's revenue management

software "to coordinate and agree upon rental housing pricing and supply." (Ex. C ¶¶ 1-2)

39.    More specifically, the Second MDL Complaint alleges that AIR and the other

Defendants colluded by using RealPage's revenue management software—"software that would

use a database of rental prices in the area (including competitors' prices) and provide the optimal

price to charge prospective tenants, with both short-and-long-term goals of increasing revenues

by raising rents." (Ex. C ¶ 4.)

40.    The Complaint further alleges that "Defendant AIR entered a written contract,

paid for, and used at least one RealPage [revenue management software solution]—YieldStar—

to manage some or all of its more than 25,000 multifamily rental units nationwide . . . to allow

AIR to benefit from its horizontal competitors' sensitive pricing and lease information before it

set or adjusted its own rental prices." (Ex. C ¶ 68.) Similar allegations are made against the other

owners and lessors of multifamily house that are alleged to be co-conspirators with AIR. (Ex. C

¶¶ 69 – 193.)

41.    In addition to the MDL litigation, state and federal governments have initiated

various legal actions and investigations related to the same alleged RealPage-related antitrust

conspiracy (together, the "Government Actions"). To date, AIR has been served with a document

preservation notice and a grand jury documents subpoena in the Government Actions.

C.    **The Primary Policy Provides Coverage for AIR's Claim**

42.    The Policy includes at least three coverage parts that provide coverage for AIR's

claim: the Privacy Liability Coverage, the Privacy Regulatory Liability Coverage, and the

Multimedia Liability Coverage.

43.    With respect to the Privacy Liability and Privacy Regulatory Liability parts, the

coverage analysis is fairly similar and is grounded in the alleged unauthorized use of confidential

and proprietary information in furtherance of the alleged antitrust conspiracy. (*See, e.g.*, Ex. C ¶¶ 1, 702-03.)

44.      The alleged "proprietary or confidential information" constituted **Private Information** within the meaning of the Policy, whether (i) owned by AIR and disclosed without authorization by RealPage to other Defendants or, alternatively, (ii) owned by other Defendants' and used by AIR with their consent. (Ex. A § IV.WW.1.)

45.      As alleged, AIR and the other Defendants purportedly used that **Private Information** "to price their units according to their collective goal of securing revenue lifts by increasing rents" (Ex. C ¶ 11.) The alleged antitrust violations and unfair competition claims thus arose out of the disclosure, collection, accessing, use, or processing of **Private Information**.

46.      Further, the alleged disclosure, collection, accessing, use, or processing of other Defendants' **Private Information** by AIR and its alleged co-conspirators is allegedly unauthorized under federal and state law as a "conspiracy to unreasonably restrain trade." (Ex. C ¶ 702; *see generally id.* ¶¶ 701-57.) and therefore constituted an alleged **Privacy Breach** by AIR or a third party for whom AIR may be **Vicariously Liable**.

47.      In addition, the alleged disclosure, collection, accessing, use, or processing of AIR's **Private Information** by RealPage and other alleged co-conspirator Defendants is unauthorized and constituted a **Privacy Breach** because such conduct is both allegedly unauthorized under federal and state law and unauthorized under ███████████████ .

████████████████████████████████████

████████████████████████████████

████████████████████████ . Given the allegations of an antitrust

Case No. 1:24-cv-01285-NYW-KAS    Document 1    filed 05/08/24    USDC Colorado    pg
11 of 23

conspiracy, AIR may be **Vicariously Liable** for this **Privacy Breach** by its alleged co-conspirators.

48.    The claims of antitrust and unfair competition violations thus "arise out of" an alleged **Privacy Liability Event**, *i.e.*, a **Privacy Breach**, by AIR or a party for whom AIR may be held **Vicariously Liable**, and are covered under the Privacy Liability Coverage.

49.    For the same reasons, the Government Actions arise out of an actual or alleged **Breach Event** (i.e., a **Privacy Liability Event**) and are covered under the Privacy Regulatory Liability Coverage.

50.    Moreover, the claims also are covered under the Multimedia Liability part, though such coverage is grounded in the allegedly improper use of RealPage's software to commit the alleged violations of antitrust and unfair competition laws.

51.    The Multimedia Liability Coverage applies to claims that arise out of a **Multimedia Wrongful Act**. A **Multimedia Wrongful Act** is defined as an actual or alleged act or omission involving "media in any form, including but not limited to, . . . electronic and digital media, . . . that results in or consists of," among other things:

> 9. unfair competition or trade practices, including but not limited to dilution, confusion, deceptive trade practices or unfair trade practices, civil actions for consumer fraud, false, disruptive or misleading advertising or misrepresentation in advertising, but only if alleged in conjunction with any of the acts listed in paragraphs 1 through 9 above.
>
> (Ex. A, Mem. 1).

52.    The Multimedia Liability Coverage thus provides coverage for AIR's alleged use of RealPage's revenue management software—"media in any form"—as part of a conspiracy

11

among all Defendants to engage in "unfair competition or trade practices." (*See generally* Ex. C

¶¶ 701-57

     **D.**    **The Primary Insurers Acted in Bad Faith and Harmed AIR**

53.    Rather than acknowledge the multiple bases for coverage of AIR's claim, the

Primary Insurers engaged in prolonged delay and unfair claim settlement practices, blatantly

misrepresented the Policy's terms, and baselessly denied coverage.

54.    <u>First</u>: After AIR provided the Insurers with notice of its claim on June 28, 2023,

the Primary Insurers strung AIR along for 97 days before providing an initial coverage decision

and the Primary Insurers did not provide a final coverage decision until January 26, 2024—213

days (or 7 months) after AIR provided notice.

55.    <u>Second</u>: During that time, the Primary Insurers were obligated to diligently search

for evidence supporting AIR's claim. That did not happen.

56.    From the beginning, AIR explained to the Primary Insurers that RealPage's or the

other Defendants' alleged use of AIR's proprietary or confidential information was unauthorized

under ███████████████████████████.

57.    But the Primary Insurers did not look into or even consider the issue.

58.    Even after October 2023, when AIR provided the Primary Insurers with a

complete copy ███████████████████, the Primary Insurers still undertook no

investigation. In fact, as late as April 2024 the Primary Insurers had yet to even review ██

█████.

59.    <u>Third</u>: The Primary Insurers so blatantly disregarded their coverage obligations under the Policy that their denial was not merely unreasonable, but also in reckless disregard for the validity of AIR's claim.

60.    For example, the Primary Insurers entirely ignored the Multimedia Liability coverage, even though the MDL and Government Actions center around the misuse of media.

61.    The Primary Insurers also ignored two thirds of the coverage provided under the Privacy Liability Coverage, misrepresenting in its denial letter that **Private Information** was limited to personal identifiable information of its lessees. In fact, the definition of **Private Information** is far broader, and also includes (1) proprietary or confidential information owned by AIR, or by a third party and that is in AIR's care, custody or control or that is used by AIR with the third party's consent, and (2) any information that is linked or linkable to a specific individual or household that is protected from collection, disclosure, retention or use by any applicable law. (Ex. A §§ IV.WW.1, 3.)

62.    Any claim by the Primary Insurers that this was a good faith mistake cannot be squared with the Second MDL Complaint's repeated allegations that AIR, RealPage, and the other Defendants illegally accessed, processed, used or disclosed each other's proprietary or confidential information in order to inflate rents. (*See, e.g.,* Ex. C ¶¶ 4-6, 8, 10-11, 13-14, 16, 18, 26, 31, 35, 38, 40-41, 43, 208, 287, 380, 694, 703, 710; *see generally id.* at ¶¶ 68-193)

63.    Equally important, the Primary Insurers disclaimed liability based on an expressly inapplicable exclusion. According to the Primary Insurers, section V of the Policy excluded from coverage claims arising from any antitrust violation or similar anti-competitive conduct. But the antitrust exclusion contained in the Policy explicitly does "not apply to a Claim under Coverage

A.1 Privacy Liability, A.2 Privacy Regulatory Liability or A.5 Multimedia Liability." (Ex. A §
VI.H.)

64.     Even after AIR pointed out the gaping holes in its analysis, the Primary Insurers
persisted in unreasonably denying coverage, further underscoring their bad faith.

65.     <u>Fourth</u>: The Primary Insurers misled AIR regarding coverage for the Government
Actions.

66.     The Primary Insurers raised no separate concern regarding the Government
Actions for many months and even initially acknowledged that one of the related Government
Actions are part of the same claim as the MDL, stating that the related legal action "falls back to
the earlier Class Action notification."

67.     However, once the insurers learned about a second related legal action, the
Primary Insurers shifted course.

68.     After misleading AIR to believe that the Government Actions would be treated as
part of the same claim for many months, the Primary Insurers issued new coverage
determinations that denied coverage for the Government Actions and once again misrepresented
the Policy's terms.

69.     Together, the Primary Insurers' wrongful, bad faith conduct unfairly misled AIR,
interfered with AIR's ability to promptly settle the underlying litigation, and forced AIR to
mount its own defense and operate under a cloud of litigation uncertainty while facing potential
liability for treble damages under federal and state antitrust laws.

**FIRST CLAIM FOR RELIEF**
(Breach of Contract – Primary Insurers)

70.     AIR incorporates the above paragraphs as if fully set forth herein.

71.     A claim arising from the alleged RealPage-related antitrust conspiracy was first made against AIR in March 2023, during the **Policy Period** or **Extended Reporting Period**.

72.     AIR promptly notified the Primary Insurers of the claim in June 2023, during the **Policy Period** or **Extended Reporting Period**.

73.     The Primary Insurers contracted with AIR to provide coverage for the claim under the Primary Policy's Privacy Liability Coverage, Privacy Regulatory Liability Coverage and Multimedia Liability Coverage.

74.     Specifically, under the Primary Policy, the Primary Insurers contractually committed to pay those amounts in excess of the $200,000 retention and up to the $5,000,000 aggregate limit of liability that AIR is legally obligated to pay as **Damages** or **Claims Expenses** arising from the covered claim.

75.     AIR, in fact, has incurred losses in investigating, defending against, responding to, and partially settling the claim, which constitute covered **Damages** and **Claims Expenses**.

76.     AIR has satisfied the $200,000 retention.

77.     All condition precedents to the Primary Policy have occurred or have been performed.

78.     Yet, the Primary Insurers denied coverage and have refused to defend or indemnify AIR, in breach if their obligations under the Primary Policy.

79.     AIR has suffered damages as a result of the Primary Insurer's breach of the Primary Policy.

80.     Accordingly, the Primary Insurers are liable for compensatory damages.

**SECOND CLAIM FOR RELIEF**
(Declaratory Judgment – Primary Insurers)

81.     AIR incorporates the above paragraphs as if fully set forth herein.

82.     There is a real, substantial, and justifiable issue in controversy between AIR and the Primary Insurers with respect to the coverage provided by the Primary Policy for the claim arising from the alleged RealPage-related antitrust conspiracy.

83.     The Primary Insurers contracted with AIR to provide coverage for the claim under the Primary Policy's Privacy Liability Coverage, Privacy Regulatory Liability Coverage and Multimedia Liability Coverage.

84.     Specifically, the Primary Insurers contractually committed to pay AIR's **Damages** and **Claim Expenses** associated with the claim to the extent they exceed the retention and up to the aggregate limit of liability.

85.     The Primary Insurers have denied coverage for such **Damages** and **Claim Expenses** in breach of their obligations under the Primary Policy.

86.     AIR is suffering current economic injury, caused by the Primary Insurers' refusal to abide by their contractual obligations under the terms of the Primary Policy, in the form of defense fees and costs incurred to defend against, respond to, and partially settle the claim.

87.     Absent relief, AIR will be subject to further injury and costs arising from the claim, including, without limitation, additional defense fees and costs, as well as the payment of the MDL settlement amount.

88.     A declaration of the rights and obligations under the Primary Policy is necessary and appropriate at this time as there are questions in actual controversy between AIR and the Primary Insurers that are ripe for judicial determination.

89.     Accordingly, AIR seeks a declaration that, under the Primary Policy, the Primary Insurers are obligated to pay AIR's current and future **Damages** and **Claims Expenses** arising from the claim to the extent they exceed the Primary Policy's retention and are less than or equal to the Primary Policy's aggregate limit of liability.

### THIRD CLAIM FOR RELIEF
(Declaratory Judgment – Everest)

90.     AIR incorporates the above paragraphs as if fully set forth herein.

91.     There is a real, substantial, and justifiable issue in controversy between AIR and Everest with respect to the coverage provided by the Excess Policy for the claim arising from the alleged RealPage-related antitrust conspiracy.

92.     Everest contracted with AIR to provide coverage for the claim under the Policy's Privacy Liability Coverage, Privacy Regulatory Liability Coverage and Multimedia Liability Coverage.

93.     Specifically, Everest contractually committed to pay AIR's **Damages** and **Claims Expenses** associated with the claim to the extent they exceed Primary Policy's aggregate liability limit and are less than or equal to the Excess Policy's aggregate limit of liability.

94.     AIR has incurred or will incur covered **Damages** and **Claims Expenses** that exhaust the Primary Policy's aggregate limit of liability, triggering coverage under the Excess Policy.

95.     Everest has denied coverage for such **Damages** and **Claim Expenses** in breach of its obligations under the Excess Policy.

96.    Absent relief, AIR will be subject to injury and costs arising from the claim, including, without limitation, additional defense fees and costs, as well as the payment of the MDL settlement amount.

97.    A declaration of the rights and obligations under the Excess Policy is necessary and appropriate at this time as there are questions in actual controversy between AIR and Everest that are ripe for judicial determination.

98.    Accordingly, AIR seeks a declaration that, under the Excess Policy, Everest is obligated to pay AIR's current and future **Damages** and **Claims Expenses** arising from the claim to the extent that they exceed the Primary Policy's aggregate limit of liability and are less than or equal to the Excess Policy's aggregate limit of liability.

## FOURTH CLAIM FOR RELIEF
(Common Law Bad Faith – Primary Insurers)

99.    AIR incorporates the above paragraphs as if fully set forth herein.

100.    Every contract imposes the duty of good faith and fair dealing in its performance and enforcement.

101.    The duty of good faith and fair dealing is an integral part of an insurance contract.

102.    In handling AIR's claim, the Primary Insurers have acted, and continue to act, in bad faith in violation of their duty of good faith and fair dealing, in that they:

a.    delayed for at least seven months in providing AIR with their final coverage position;

b.    failed to investigate AIR's claim in good faith or seek evidence supporting AIR's claim for coverage;

c.   ignored, at least until April 2024, documentary evidence (███████████ █████) that supported AIR's claim for coverage, which AIR mentioned repeatedly and specifically provided to the Primary Insurers in October 2023;

d.   manufactured factually incorrect reasons to deny coverage and repeatedly misrepresented the terms of the Primary Policy, misleading AIR regarding the scope and nature of its coverage under the Primary Policy;

e.   misled AIR regarding their coverage position as to the Government Actions by treating the first such action as part of the same claim as the MDL and then changing its position five months after AIR provided notice of the second action; and

f.   denied coverage with no reasonable basis to do so, and when no reasonable insurer would have done so;

g.   engaged in conduct demonstrating a gross disregard of AIR's interests by deliberately or recklessly failing to place AIR's interests on equal footing with their own; and

h.   handled AIR's claim unreasonably and with reckless disregard for its validity under circumstances evincing willful and wanton conduct.

103.   As a direct result of the Primary Insurers' bad faith conduct, AIR has suffered substantial damages to, among other things, its business operations and goodwill, which damages were within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.

104.    Accordingly, the Primary Insurers are liable to AIR for consequential damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
(Violation of Colorado Rev. Stat. §§ 10-3-1115 – Primary Insurers)

105.    AIR incorporates the above paragraphs as if set forth in full herein.

106.    The Primary Insurers unreasonably delayed and/or denied payment of AIR's claim in violation § 10-3-1115 in that, among other things, they:

    a.   engaged in unfair claim settlement practices in violation of Colo. Rev. Stat. § 10-3-1104(h);

    b.   failed to promptly investigate AIR's claim;

    c.   waited more than three months to provide AIR with an initial coverage determination;

    d.   delayed an additional three months claiming they needed more information from AIR that they already had and then ignored the information when it was provided at least three more times; and

    e.   delayed or denied coverage without a reasonable basis.

107.    As a result of the Primary Insurers' unreasonable delay and denial of payment, under Colo. Rev. Stat. § 10-3-1116, AIR is entitled to recover reasonable attorney fees and court costs and two times its covered benefit.

## PRAYER FOR RELIEF

WHEREFORE, AIR respectfully requests that this Court:

A.    Enter a judgment finding that Munich Re and Ki breached the Primary Policy and are obligated to pay AIR's resulting damages in an amount to be determined at trial;

B.    Enter a judgment declaring that, under the Primary Policy, Munich Re and Ki are obligated to pay AIR's **Damages** and **Claim Expenses**, incurred now or in the future in connection with the RealPage-related antitrust conspiracy allegations, to the extent they exceed the Primary's Policy's retention and are less than or equal to Primary Policy's aggregate limit of liability;

C.    Enter a judgment declaring that under the Excess Policy, Everest is obligated to pay AIR's **Damages** and **Claim Expenses**, incurred now or in the future in connection with the RealPage-related antitrust conspiracy allegations, to the extent they exceed the Primary's Policy's aggregate limit of liability and are less than or equal to the Excess Policy's aggregate limit of liability;

D.    Enter a judgment finding that Munich Re and Ki acted in bad faith under circumstances evincing willful and wanton conduct, and ordering Munich Re and Ki to pay damages in an amount to be determined at trial;

E.    Enter a judgment finding that Munich Re and Ki violated Colo. Rev. Stat. § 10-3-1115, and order Munich Re and Ki to pay attorney fees, court costs, and two times AIR's covered benefit;

F.    Order pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

G.    Grant such other and further relief as the Court deems just and necessary under

the circumstances.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated:  May 8, 2024.                    Respectfully submitted,


                                        *s/ Judith P. Youngman*
                                        Judith P. Youngman
                                        Michael T. Williams
                                        Wheeler Trigg O'Donnell LLP
                                        370 Seventeenth Street, Suite 4500
                                        Denver, CO 80202
                                        Telephone:  303.244.1800
                                        Facsimile:   303.244.1879
                                        Email:   youngman@wtotrial.com
                                                 williams@wtotrial.com

                                        Attorneys for Plaintiff Apartment Income
                                        REIT Corp.